UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Nemanja Kapisoda and<br>Stephanie Delreal,<br><br>      Plaintiffs,<br><br>      v.<br><br>Alejandro Mayorkas, Secretary, *et al.*,<br><br>      Defendants. | Case No. 21 CV 4312<br><br>Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Nemanja Kapisoda ("Kapisoda") and Stephanie Delreal ("Delreal") initiated this action seeking to reverse a May 2, 2019 decision by the U.S. Citizenship and Immigration Services ("USCIS") Field Office Director to deny the Form I-130 Petition for Alien Relative filed by Delreal, an American citizen, on behalf of her husband Kapisoda, a citizen of Montenegro. Defendants, officers at USCIS and the Department of Homeland Security, seek to affirm the Director's decision.

The parties have cross-moved for summary judgement, [15], [20], and, for the reasons explained below, this Court grants Defendants' motion [20] and denies Plaintiffs' motion [15].

**I.    Legal Standards**

    **A.    Administrative Standard and Burden of Proof**

When an American citizen marries a non-citizen, the citizen may file a Form I-130 to petition the government to recognize the non-citizen as a legal permanent resident. *See* 8 U.S.C. § 1154(a)(1)(A)(i) ("any citizen of the United States claiming

that an alien is entitled to classification by reason of a relationship described in paragraph (1), (3), or (4) of section 1153(a) of this title or to an immediate relative status under section 1151(b)(2)(A)(i) of this title may file a petition with the Attorney General for such classification."). Under the statute, "'no petition shall be approved' if an alien has received (or tried to receive) immigration benefits through a sham marriage." *Ogbolumani v. Napolitano*, 557 F.3d 729, 733 (7th Cir. 2009) (quoting 8 U.S.C. § 1154(c)). So, if an alien is "an immediate relative (spouses of United States citizens are included in this group, 8 U.S.C. § 1151(b)(2)(A)(i)), the petition must be granted unless there is a history of fraud lurking in the background." *Id.* The couple has the burden to persuade the government that they intended to establish a life together when they married. *See Matter of McKee*, 17 I. & N. Dec. 332, 334–35 (BIA 1980); *Matter of Brantigan*, 11 I. & N. Dec. 493, 493 (BIA 1966).

The government initially has the burden to show, by "substantial and probative evidence" that the marriage was a sham from its inception. 8 C.F.R. § 204.2(a)(1)(ii). If the government reasonably doubts the validity of the marriage, the petitioner must present evidence to demonstrate that the purpose of the marriage was not to circumvent immigration laws. *See Matter of Laureano*, 19 I. & N. Dec. 1, 3 (BIA 1983); *Matter of Kahy*, 19 I. & N. Dec. 803, 806-07 (BIA 1988).

### B. Standard of Review in this Court

The Administrative Procedure Act governs this Court's review of a final decision by the Field Office Director. 5 U.S.C. §§ 702, 704. Under the Act, this Court's review is limited to the Administrative Record [12]. 5 U.S.C. § 706. This Court may

2

reverse the Field Office Director's decision under limited circumstances, such as where the decision is arbitrary and capricious or reached without observance of procedure required by law. 5 U.S.C. § 706(2); *Mt. Sinai Hospital Medical Center v. Shalala*, 196 F.3d 703, 708 (7th Cir. 1999). But as the Seventh Circuit has observed, petitioners trying to invoke such circumstances "have a high hurdle to jump"; "so long as a reasonable mind could find adequate support for the decision, it must stand," even if the Court ultimately may have reached a different conclusion. *Ogbolumani*, 557 F.3d at 733 (citing *Ghaly v. INS*, 48 F.3d 1426, 1431 (7th Cir. 1995)).

## II. Facts

Kapisoda, a citizen of Montenegro, entered the United States on June 8, 2015. [12-5] at 10. He married Delreal, a citizen of the United States, on September 17, 2016, in Chicago. [12-3] at 213–15. On November 1, 2016, Delreal filed a Form I-130 on Kapisoda's behalf. *Id.* at 210–12. Delreal and Kapisoda then appeared for an interview in connection with the Form I-130 on March 14, 2017. [12-2] at 1. The following month, on April 13, 2017, Delreal and Kapisoda appeared for another interview, during which they gave sworn statements while separated from one another. [12-3] at 223–41. While the Form I-130 was pending, Delreal and Kapisoda submitted documentation in support of the petition, including birth certificates for both Delreal and Kapisoda, a marriage certificate, and Kapisoda's Serbian criminal record. *Id.* at 12–13.

After Delreal and Kapisoda appeared for their March and April interviews, an Immigration Services Officer, suspecting that their marriage was fraudulent,

referred the case to the Fraud Detection and National Security unit ("FDNS") for an investigation. [12-3] at 2. FDNS opened the investigation on February 7, 2018, based at least in part upon troubling discrepancies in the couple's statements. [12-3] at 2. The sworn statements given by Delreal and Kapisoda during their April 2017 interview included discrepancies on the following subjects: the name of the friend accompanying Kapisoda when he first met Delreal; the name of the friend accompanying Delreal when she first met Kapisoda; the duration of Kapisoda's most recent work trip, which had occurred two weeks prior to the interview; the last time the couple went out to eat together; the church Kapisoda attends; the payor of the fee to the Form I-130 preparer; and whether Delreal had ever bought Kapisoda any gifts. [12-5] at 11.

On July 24, 2018, FDNS conducted a site visit at 7890 Ogden Avenue, Apt. 2D, Lyons, Illinois, the claimed marital residence, to determine, as part of its investigation, whether Delreal and Kapisoda lived together. [12-5] at 6. During the site visit, only Kapisoda was present, and he noted that Delreal "stayed at her mom's house." *Id.* at 7. FDNS took several photographs while inside the apartment, which depict the following: an IRS bill addressed to Delreal in the living room; photos of the couple on the television stand; "minimal female clothing" in the closet; "some feminine products" on a desk; and female jewelry and accessories in the bedroom. *Id.* at 10–11. During the site visit, Kapisoda told FDNS that the second bedroom belonged to Kapisoda's brother, who was paying "some rent" for the room. *Id.* at 7. At the end of the site visit, Kapisoda incorrectly told FDNS that Delreal worked at a dentist office,

4

*id.* at 7, when she in fact worked for Central Nursing, *id.* at 12. Kapisoda was also unable to identify the address for Delreal's mother, *id.* at 7, which is 1102 N. Karlov Avenue in Chicago, *id.* at 4.

After completing the site visit to the claimed marital residence, FDNS went to the complex's leasing office, Ogden Trails, LLC. [12-5] at 3. FDNS spoke to the property manager, who identified Kapisoda in two separate photo lineups but was unable to identify Delreal. *Id.* at 4. The property manager was usure as to whether both Delreal and Kapisoda were present during their lease signing. *Id.*

Later that same day, FDNS conducted a site visit at the residence of Delreal's mother. *Id.* FDNS chose to conduct this site visit based upon Kapisoda's statement that Delreal was staying with her mother. *Id.* When FDNS arrived, the male who answered the door indicated that Delreal "lived downstairs." *Id.* Although Delreal was not present during this site visit, FDNS was able to speak with her sister, Jennifer. *Id.* at 5. Jennifer stated that: Delreal and Kapisoda are married; Delreal "'sometimes' stays with Jennifer"; Delreal "goes back and forth between her homes"; Jennifer did not know the address for the Lyons residence; and Jennifer's daughter "loves" Kapisoda. *Id.*

After discussing the results of FDNS's site visit to the claimed marital residence, Jennifer represented that Delreal "usually stays here now," sleeping on the floor two or three times per week but does not live at the house. *Id.* Jennifer also claimed that she helped Delreal move into the Lyons apartment, and she provided an accurate description of that residence. *Id.*

5

Throughout the investigation, FDNS requested and received employment records from four of Delreal's former employers: Courtyard Healthcare; Central Nursing; Talro Insurance; and Image Dental. *Id.* at 11. Delreal's application to Image Dental was dated March 22, 2018, and her Central Nursing application was dated June 13, 2018. *Id.* On all four of these employment records, which consisted of applications and W-4s, Delreal indicated that her present address was 2748 W. Cortez St., *id.*, at which she last resided in 2015, *id.* at 6. Pursuant to a statement given by the landlord for the Cortez residence, none of Delreal's relatives have resided at that residence since 2016. *Id.* Delreal failed to list Kapisoda as an emergency contact on any of her employment applications. *Id.* at 11.

Delreal's address is also listed as 2748 W. Cortez Street on the following documents: three arrest reports dated between May 16, 2017 and March 30, 2018; a U.S. passport application dated in October 2016; and an Illinois ID card application dated September 16, 2016. *Id.* at 12. Delreal's probation officer also identified her address as 2748 W. Cortez Street, although probation also noted that Delreal was listed as married and residing at 1102 N. Karlov Avenue, the address provided for Delreal's mother and sister Jennifer. *Id.* at 9.

FDNS attempted to meet and interview Delreal on her proposed date of December 4, 2018, after "she failed to show for her subpoena interview," *id.* at 9, which was originally scheduled for November 27, 2018, *id.* at 15. Delreal declined to be interviewed on the proposed date due to a meeting with her probation officer that morning, and she never answered or returned FDNS's subsequent phone calls. *Id.*

6

FDNS issued its Statement of Findings ("SOF") on January 23, 2019. [12-5] at 2–13. The SOF notes the facts above, and also adds another troubling revelation: FDNS discovered in its investigation that Angelica Delreal ("Angelica"), Delreal's cousin and emergency contact, "married a Serbian national" only eleven days after Delreal married Kapisoda. *Id.* at 12. That marriage too had been investigated and found to be a sham. *Id.* FDNS was unable to ask Delreal about the similarities between her marriage and Angelica's sham marriage because Delreal declined to be interviewed. *Id.* Based upon this evidence, FDNS concluded that Delreal and Kapisoda "conspired to enter into a fraudulent marriage" so that Kapisoda could "gain an immigration benefit." [12-5] at 13.

After FDNS issued its SOF, USCIS issued a Notice of Intent to Deny Petition for Alien Relative ("NOID") on February 26, 2019. [12-3] at 12. In the NOID, the adjudicator summarized the findings of the FDNS investigation to support the conclusion that Delreal and Kapisoda do not live together and have not "commingled" their assets. *Id.* at 13. Finally, the adjudicator indicated that the NOID should be considered an "opportunity" to submit additional documentation to counteract the FDNS findings. *Id.* at 14.

Delreal and Kapisoda accepted the opportunity, and, in their response, dated March 28, 2019, they submitted some additional documentation in support of the Form I-130. *Id.* at 15–200. According to the response, the documentation included the following: jointly filed tax returns and related letters; the apartment lease agreement for the claimed marital residence; a real estate listing for a jointly owned

7

property in Montenegro; Kapisoda's life insurance policy; Chase Bank statements for a joint account; credit cards for a joint credit card account; a renter's insurance policy for the claimed marital residence; Xfinity statements; affidavits from family members; and photographs. *Id.* at 21.

Their response also included counterarguments and additional explanations to rebut the USCIS's conclusions set forth in the NOID. *Id.* at 15–22. First, the response letter requested information about the property manager who was unable to identify Delreal out of a photo lineup, claiming a right to cross-examine this individual and review his statement. *Id.* at 17. Moreover, as to the site visit to the claimed marital residence, Delreal claimed in her affidavit (and echoed in Jennfier's affidavit) that she is not comfortable staying at the residence while Kapisoda is away. *Id.* at 168–71. Delreal further explained that she stayed at her mother's home on the day the site visit took place, because Kapisoda had just finished a work trip. *Id.* at 168–69. In response to the evidence that few of her possessions were located within the apartment, Delreal claimed that many of her personal items were "stored" in the claimed marital residence. *Id.* at 169. In her affidavit, Delreal also claimed that she did not respond to USCIS's attempts to contact her because she thought these messages were fraudulent. *Id.* at 168. Finally, Delreal represented that receiving mail at the claimed marital residence was unpredictable, and she therefore used the Cortez address on employment records and the passport application for that reason. *Id.* at 169. Delreal indicated that she was also still living at the Cortez address at the time she applied for her state ID. *Id.*

On May 2, 2019, the Field Office Director issued a decision denying the Form I-130, concluding that Delreal and Kapisoda failed to show that their marriage was bona fide. *Id.* at 7, 10. The Director indicated that, in reaching this decision, she considered the additional evidence and explanations submitted by Plaintiffs in response to the February 26, 2019 NOID. *Id.* at 7–10. The Director rejected Delreal's reason for her absence during the marital residence site visit, finding that she spends an "extreme amount of time" at her mother's house, even when Kapisoda is at home. *Id.* at 8. The Director also rejected Delreal's explanation for her failure to reply to calls and text messages from USCIS, noting that her suspicions of fraud constituted a "false response" since Delreal was well aware of the interviews and site visits. *Id.* The Director also rejected Delreal's request to identify the property manager who could not identify her. *Id.* at 9.

Significantly, the Director also found that most of the documentation submitted by Plaintiffs were created in anticipation of the first USCIS interview in March of 2017: Plaintiffs applied for the insurance policies just three days before the interview; and they opened the Chase bank account a month before the interview. *Id.* at 8–9. Plaintiffs submitted only one Chase Bank statement, which showed that Plaintiffs had opened the account just one month before the scheduled interview, placing just $500 into the account, which had a $302.52 balance. *Id.* Similarly, Plaintiffs submitted credit cards issued in their names, but did not submit "proof of activity or payment history"; indeed, Plaintiffs had not even signed the cards. *Id.* The Director also noted that Plaintiffs submitted no payment history to demonstrate

maintenance of the renter's insurance policy beyond the initial payment. *Id.* at 8. Moreover, the Director stated that the cable bills "do not establish joint residency," *id.*, and seem to have been established in early 2017, before the scheduled first interview, *id.* at 160–67. Similarly, Kapisoda's life insurance policy naming Delreal as a beneficiary was dated from March 11, 2017, *id.* at 90, just three days before the initial interview, and again Plaintiffs failed to provide any payment history to demonstrate maintenance of the policy after the interview, *id.* at 9. The Director also discounted the lease agreement submitted, since the property manager was unable to confirm that Delreal lived at the apartment. *Id.* Finally, the Director believed that the photographs submitted, which were undated, appeared to be "staged." *Id.*

The Director also noted some discrepancies in the tax documents submitted. *Id.* First, the letters submitted from the IRS in Delreal's name pertained to tax years 2013 through 2016, and were thus largely irrelevant, as Delreal did not meet Kapisoda until late 2016. *Id.* Moreover, the Director read the 2017 tax return to indicate a total combined income of $40,592 and business income of $21,000, noting that Plaintiffs state in their response affidavits that they both work full time and Kapisoda was "never home." *Id.* The Director also noted that Delreal did not submit proof of employment, which would have been important to her claim that she stayed at her mother's house due to its proximity to Delreal's workplace. *Id.*

Moreover, the Director observed that all affidavits submitted were from family members, making them inherently self-serving, and she cited "8 C.F.R. Section 7:16," to support her finding. The Director noted that the affidavits "will naturally be biased

10

in their support" and seemed to find it significant that Plaintiffs failed to submit any affidavits from friends, including those friends depicted in the photographs Plaintiffs submitted. *Id.* The affidavits did not include any supporting documentation for the events described therein, and it was not clear that Kapisoda's parents' affidavits were properly notarized. *Id.*

### III. Analysis

Plaintiffs ask the Court to declare unlawful and set aside the Director's decision to deny Delreal's Form I-130 petition and remand for further findings. In support, Plaintiffs argue that the Director's decision cannot stand because: (1) the government departed from established policies by failing to disclose the property manager's identity to the Plaintiffs; and (2) the Field Office Director's May 2, 2019 decision was arbitrary and capricious because it "ignor[ed] and misstat[ed]" the evidence to support the conclusion that Delreal and Kapisoda had entered into a fraudulent marriage. This Court addresses each argument in turn.

#### A. Alleged Procedural Violation

In the Notice of Intent to Deny, the Director indicated that during its investigation, USCIS interviewed the property manager of the claimed marital residence, but the property manager was unable to identify Delreal as a resident of the property. [12-3] at 13. Plaintiffs argue that Defendants violated their statutory obligation under 8 C.F.R. § 103.2(b)(16) by failing to identify the property manager and by denying Plaintiffs the opportunity to view the statement given by the property manager. [12-3] at 17– 18; [17] at 8; [24] at 8–9. Under the right circumstances, a

11

procedural violation can warrant setting aside the government's decision. 5 U.S.C. § 706(2)(D); *see also Mt. Sinai Hospital Medical Center*, 196 F.3d at 708; *Ghaly*, 48 F.3d at 1431.

Certainly, administrative regulations require that when the applicant or petitioner is unaware of derogatory information relied upon by the adjudicator, "h/she shall be advised of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered. 8 C.F.R. § 103.2(b)(16)(i). But, as the Seventh Circuit has recognized, the regulations do not require the government to provide, "in painstaking detail," all the evidence it finds. *Ogbolumani*, 557 F.3d at 735. Instead, the Court in *Ogbolumani* found that the Plaintiffs' argument to the contrary "misses the mark, and by a lot." *Id.* In *Ogbolumani*, not all witnesses were named, but "the important ones were," which the Seventh Circuit found sufficient. *Id.*

Here, in the Notice of Intent to Deny, the Director explained that USCIS spoke with the property manager of the claimed marital residence and summarized the findings of that interview. [12-3] at 13. In doing so, the Director gave Plaintiffs the required opportunity to rebut this information, as Plaintiffs did not necessarily need the Director to identify the name of the property manager *of their own residence* to independently reach out to him. Therefore, the Director was not in violation of 8 C.F.R. § 103.2(b)(16)(i) when she did not identify the property manager by name. Indeed, Plaintiffs enjoyed a full opportunity to rebut any inference drawn from the landlord's inability to confirm residency, but they simply failed to do so.

### B. The Director's Decision

Plaintiffs face a high hurdle in arguing that the Field Office Director's decision was arbitrary and capricious. In light of the posture of the case, this Court's role here remains limited to determining whether USCIS examined the "relevant data" and articulated a "satisfactory explanation for its actions including a 'rational connection between the facts found and the choice made.'" *Indiana Forest Alliance, Inc. v. U.S. Forest Service*, 325 F.3d 851, 859 (7th Cir. 2003) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). In making this determination, this Court asks whether the Director found "substantial and probative evidence" of marriage fraud, 8 C.F.R. § 204.2(a)(1)(ii), meaning evidence a reasonable mind would find adequate to support the conclusion that the marriage constituted a sham. *Ghaly*, 48 F.3d at 1431. After its review of the Administrative Record, this Court concludes that a "rational connection" exists between the facts found by the Director and the Director's denial of the Form I-130.

Many of the documents submitted by Delreal and Kapisoda in response to the Notice of Intent to Deny were ostensibly created in anticipation of their March 14, 2017 interview. For example, the Chase Bank account was created one month before the interview, [12-3] at 106–09, while the life insurance policy and renter's insurance policy were created within mere days of the interview, *id.* at 83–91, 112–13, and five or six months after Plaintiffs married. The record contained no evidence to suggest that Plaintiffs maintained the policies after their interviews, *id.* at 83–91, 112–13, and the credit cards submitted do not indicate whether the credit cards were used, or

13

if any payments were made, *id.* at 110–11. Indeed, as noted above, Plaintiffs had not even signed the cards.

Moreover, the evidence was, at best, mixed on the question of whether Delreal ever lived in the alleged marital apartment. In fact, the only evidence that Delreal did live in the apartment was the lease, which was signed in her name as well as Kapisoda's name, and her own statement that she lived there (which was contradicted by substantial evidence, including her own inconsistent statements about her other addresses), *id.* at 72, 74. Clearly, the vast majority of personal items in the apartment belonged to Kapisoda, [12-5] at 10–11. At most, the USCIS investigation revealed that Delreal kept *some* clothing, jewelry, and accessories at the apartment, as well as some feminine products and received at least one piece of mail at the address. [12-5] at 10–11. But Delreal, Kapisoda, and Jennifer all confirmed that Delreal spent considerable time at her mother's home. [12-3] at 168, 170, 171. And Delreal's use of other addresses on job applications, her passport application, and in dealings with the police, [12-5] at 9–12, all buttress the conclusion that she did not consider the purported marital apartment to be her home. Based upon the record, USCIS's conclusion that Delreal does not reside at the property was reasonable.

That is not to say that the Director's decision was free from any error. The Director appears to have read the couple's 2017 tax return incorrectly and cited a seemingly nonexistent regulation in discounting the affidavits from Plaintiffs' family members. But both federal and state tax returns for the 2017 tax year were

14

submitted unsigned, [12-3] at 41, 47, and even the correct income level ($89,640, *id.* at 40) remains at odds with the couple's Chase account, showing a single deposit of $500 and a balance of about $300, *id.* at 107. Given the nature and timing of the evidence as a whole, the Director's findings remained reasonable and any errors harmless.

In *Ogbolumani*, after noting that plaintiffs like Delreal face "a high hurdle to jump," the Seventh Circuit found that "given the wealth of evidence uncovered during USCIS's investigation, that high hurdle is insurmountable." 557 F.3d at 733. So too here. In short, this Court cannot conclude that the Field Office Director made an arbitrary and capricious decision when the record contained an abundance of evidence showing that the couple's marriage was a sham.

### IV. Conclusion

For the reasons explained above, the Court grants Defendants' motion for summary judgment [20] and denies Plaintiffs' cross-motion for summary judgment [15].

Dated: September 26, 2022

Entered:

John Robert Blakey
United States District Judge

15